IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>C.W. MINING COMPANY,<br><br>    Debtor. | Bankruptcy No. 08-20105<br>(Chapter 7) |
| KENNETH A. RUSHTON,<br>Chapter 7 Trustee,<br><br>    Plaintiff/Appellee,<br><br><br>    v.<br><br><br>STANDARD INDUSTRIES, INC., ABM, INC., FIDELITY FUNDING COMPANY, SECURITY FUNDING INC., WORLD ENTERPRISES,<br><br>    Defendants/Appellants,<br>and<br><br>UTAH AMERICAN ENERGY, INC.,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER ON COMBINED APPEAL<br><br><br>Case No. 2:10-CV-271 TS |

This matter is before the Court on Standard Industries, Inc. ("Standard"), ABM, Inc.

("ABM"), Fidelity Funding Company ("Fidelity Funding"), Security Funding, Inc. ("Security

Funding"), and World Enterprises's ("World") (collectively referred to as "Appellants") Appeal

from Bankruptcy Adversary Proceeding No. 09-2047 in Bankruptcy Case No. 08-20105.  Due to

1

the similarity of facts and issues involved, two separate appeals to this Court by these parties were consolidated into this action.[1]   The Court has considered the briefs and evidence submitted by the parties and, for the reasons provided more fully below, will affirm in part and reverse in part the bankruptcy court's decision.

## I.  BACKGROUND

At issue in this appeal is $2,797,246.79 held in an account (the "UEI Receivable") by Utah American Energy, Inc. ("UEI").  UEI makes no claim to the amount being held in the UEI Receivable.  Rather, because competing claims were made on the funds by other parties, UEI held back payment and interpleaded the UEI Receivable into the bankruptcy court.  The parties to this appeal claim an interest in the UEI Receivable.

This appeal arises out of the involuntary bankruptcy proceedings of C.W. Mining Company ("CWM").  Prior to entering bankruptcy, CWM was in the business of mining coal. CWM's primary asset was the Bear Canyon mine, an underground coal mine located in Emery County, Utah.  The Bear Canyon mine is located on property owned by C.O.P. Coal Development Company ("COP").  CWM began operating the Bear Canyon mine in 1982 or 1983.  In March of 1997, COP and CWM entered into a coal mining agreement that granted CWM the express right to mine the Bear Canyon mine.

On January 8, 2008, an involuntary Chapter 11 bankruptcy petition was filed against CWM in the Bankruptcy Court for the District of Utah.  An order for relief was entered on September 26, 2008, and on November 13, 2008, CWM's Chapter 11 bankruptcy proceeding was

---

[1]*See* Case Nos. 2:10-CV-271 and 2:10-CV-808.

2

converted to a Chapter 7 liquidation proceeding.  On November 19, 2008, Kenneth A. Rushton (the "Trustee") was appointed as trustee of CWM.

The Trustee initiated the underlying adversary proceeding on February 9, 2009.  In that proceeding, the Trustee filed a motion for partial summary judgment seeking a determination of the parties' rights to the proceeds of the UEI Receivable.  A creditor of CWM, Aquila Inc., joined in the Trustee's motion.  On August 24, 2010, the bankruptcy court entered its initial Memorandum Decision Granting in Part and Denying in Part Trustee's Motion for Partial Summary Judgment as to UEI Receivable and Avoidance of Liens.[2]  The Trustee and Standard both sought revisions of the bankruptcy court's decision.  On December 8, 2010, the bankruptcy court entered its Amended Memorandum Decision Granting in Part and Denying in Part Trustee's Motion for Partial Summary Judgment as to UEI Receivable and Avoidance of Liens (the "Amended Memorandum Decision").[3]

Pursuant to the Amended Memorandum Decision, the bankruptcy court found for the Trustee on the majority of his claims in the underlying adversary proceeding.  The bankruptcy court found that Standard possessed only a security interest in the UEI Receivable and that the Appellants failed to properly perfect any security interest they may have had in the UEI Receivable.  Pursuant to these findings, on July 2, 2010, the bankruptcy court entered a final order instructing the court clerk to pay the UEI Receivable proceeds to the Trustee.

---

[2]*See* Docket No. 17, at 1244–81.

[3]*See id.* at 1439–78.

Appellants assert that the bankruptcy court committed reversible error in reaching the legal conclusions that form the basis of its Amended Memorandum Decision and subsequent order.

A.      AGREEMENTS

Throughout the time period that CWM operated the Bear Canyon mine, Standard acted as CWM's coal broker.  During the majority of that time, Standard and CWM operated under a verbal agreement.  However, CWM and Standard did enter into at least two written agreements.  Standard objects to the bankruptcy court's interpretation and application of those agreements.

The first agreement at issue is titled the "Advance Payment Agreement."  The Advance Payment Agreement has entered into by Standard and CWM and has an effective date of March 27, 2001.  The preamble to the Advance Payment Agreement discusses the existing brokerage relationship between the parties and CWM's need for financing to pay its operating expenses and implement a new mining method.[4]  The preamble also provides that "Standard is willing to make advance payments to CWM against future coal production, In [sic] order to enable CWM to remain in operation until CWM commences longwall mining."[5]

Paragraph three of the Advance Payment Agreement provides that "Standard may from time to time make advance payments to or on behalf of CWM for the purchase of coal not yet mined."[6]  The same paragraph further clarifies that "Standard's payments to CWM are advance payments for purchase of coal not yet mined, for which Standard shall have full legal and

---

[4]*See* Docket No. 30 Ex. 1, at 1.

[5]*Id*.

[6]*Id*. at 2.

equitable title to the coal as it is mined by CWM, and shall not be construed as a mere loan to CWM."[7]

Paragraphs four and five provide for the accrual of interest and fees on amounts advanced by Standard.  Paragraphs nine and eleven grant Standard ultimate discretion in the acceptance and application of payments from CWM.[8]  In this same vein, paragraph eight provides that "CWM shall pay Standard all amounts due under [the Advance Payment Agreement] either in cash from the proceeds of coal sales, or in coal as a commodity, at Standard's option."[9]  As an added protection, paragraph thirteen provides Standard

> a security interest in all of CWM's personal property (both tangible and intangible) without limitation, wherever located, whether or not in CWM's possession, custody or control, and whether or not vested or contingent, liquidated or unliquidated, now owned or hereafter acquired, and all profits and proceeds from the appreciation, sale, use, or disposition of CWM's property.[10]

The remainder of the Advance Payment Agreement contains boilerplate language and discusses the parties' rights and recourses in the event of a default, ability to amend the agreement, and the duration of the agreement.

The second agreement at issue is titled the "Coal Sales Agency Agreement" ("Agency Agreement").  The Agency Agreement has an effective date of March 5, 2007 and appoints Standard as CWM's exclusive sales agent for coal produced from the Bear Canyon mine.  The Agency Agreement indicates in its preamble that CWM and Standard wish to appoint Standard

---

[7]*Id.*

[8]*Id.* at 2–3.

[9]*Id.* at 3.

[10]*Id.*

as CWM's "agent for the exclusive sale of coal mined by [CWM]."[11]  Paragraph two provides

that:

> [Standard] shall be [CWM]'s sole and exclusive agent and representative for all
> purposes of this Agreement, including the sale of all coal mined by [CWM],
> which shall be made available to [CWM]'s customers exclusively through
> [Standard].  [CWM] shall direct to [Standard] all inquiries from any customer,
> potential customer, or third party regarding the purchase and sale of coal.[12]

Paragraph 3 of the Agency Agreement provides:

> [CWM] shall at no time acquire legal or equitable title to the coal mined by
> [CWM].  All legal and equitable title to the coal produced by [CWM] shall
> transfer from [CWM's] lessor to [Standard] immediately upon severance of the
> coal from its seam, thereby absolutely and irrevocably divesting [CWM's] lessor
> of title and simultaneously vesting [Standard] with all right, title and interest in
> and to the coal, subject to the rights of [CWM's] customers under the terms of
> their coal sales contracts, including the customers' rights to take possession of the
> coal and have title to the coal transferred to them.  [Standard's] title to the coal
> shall automatically transfer from [Standard] to [CWM's] customers upon transfer
> of possession of the coal to the customers, whether by loading the coal on
> customers' railcars or trucks, or as otherwise provided for in the customers' coal
> sales contracts.[13]

The remainder of the Agency Agreement principally deals with the breakdown of rights

and obligations between CWM and Standard as producer and broker of coal, respectively.

Paragraphs 8, 9, and 10 are particularly relevant in this case.  Those paragraphs provide as

follows:

> 8.  [Standard] may from time to time loan money to [CWM], or advance
> money to or for the benefit of or on the account of [CWM], for which [CWM]
> shall pay [Standard] according to the terms of any agreement for the loan or
> advancement of such monies.

---

[11]*Id*. Ex. 2, at 1.

[12]*Id.*

[13]*Id.*

9.  Unless otherwise set by a promissory note or other agreement, any indebtedness of [CWM] to [Standard] under this Agreement shall accrue interest at twelve (12) percent per annum.

10.  [CWM] irrevocably assigns, transfers, and conveys to [Standard] all of [CWM's] right, title and interest to all amounts now due or to become due to [CWM], including but not limited to all proceeds from the sale of coal payable to [CWM], under any and all present and future contracts between [CWM] and its customers, together with all amounts payable or to become payable to [CWM] under any renewal, amendment, extension, modification, replacement, or substitution of such contracts.  This assignment is given as an absolute assignment, transfer and conveyance, and not as a mere security interest.  [CWM] shall indemnify and hold [Standard] harmless, and at [Standard's] request defend [Standard] at [CWM's] expense, from any and all claims by third parties to any interest in the assigned coal sale proceeds and any other amounts assigned, including the payment of all court costs, reasonable attorney fees, consequential and incidental damages, and other expenses of any nature whatever, that [Standard] may incur in connection with such claims.[14]

Also relevant to this dispute are two contracts relating to the sale of coal to UEI.  On November 28, 2007, CWM entered into a "Spot Coal Supply Agreement" (the "UEI Agreement"), with UEI.  On the same day, CWM and Standard entered an "Assignment of Coal Sale Contract Proceeds" (the "Assignment Agreement") whereby CWM assigned to Standard its "right, title and interest to all amounts now due or to become due to [CWM], including but not limited to all proceeds from the sale of coal payable to [CWM], under that certain [UEI Agreement]."[15]  The UEI Agreement was later amended to reflect that CWM "assigned all right and title to the proceeds" of the UEI Agreement to Standard.[16]

After reviewing the plain language of the Advance Payment Agreement and Agency Agreement, the bankruptcy court found the agreements to be unambiguous and capable of

---

[14]*Id*. at 2.

[15]*Id*. Ex. 3, at 2.

[16]*Id*. Ex. 4, at 10.

interpretation as a matter of law.  In reaching this finding, the bankruptcy court rejected as

untenable Standard's proposed interpretation of the agreements—that the agreements were

purchase contracts or an outright assignment of the coal extracted by CWM to Standard.  The

bankruptcy court instead adopted the Trustee's interpretation of the agreements and found that

the Advance Payment Agreement and Agency Agreement were disguised security agreements

under which CWM retained its ownership interest in the coal or any receivable generated by the

coal subject to any properly perfected security interest.

B.      FINANCING STATEMENTS

        Prior to entering bankruptcy, CWM obtained financing from Standard, ABM, Fidelity

Funding, Security Funding, and World.  Each of the agreements between CWM and the

Appellants contained language providing the Appellants with a security interest in CWM's

assets.  ABM, for example, entered a loan agreement with CWM whereby CWM granted ABM

> a security interest in all of the Property described below that [CWM] now own[s]
> and that [CWM] may own in the future (including, but not limited to, all parts,
> accessories, repairs, improvements, and accessions to the Property) wherever the
> Property is or may be located, and all proceeds and products from the Property
> including inventory, equipment, accounts, instruments, documents, chattel paper
> and other rights to payment, general intangibles, and all inventory, accounts
> receivable, [and] equipment.[17]

        The Appellants sought to secure their respective interests in CWM's collateral by filing

Uniform Commercial Code ("UCC") financing statements.  The first such statement was filed in

May 2007 by Security Funding, ABM, and World.  The same parties filed an additional financing

statement in August 2007.  In October 2007, Fidelity Funding filed a financing statement on

behalf of ABM, Fidelity Funding, Security Funding, and World.  Finally, in November 2007,

---

[17]Docket No. 17, at 1486 (internal quotation marks and citation omitted).

Standard, ABM, Fidelity Funding, Security Funding, and World each filed separate UCC financing statements. Each of the financing statements identified CWM as "C W Mining Company" or "CW Mining Company."

The Utah Division of Corporations and Commercial Code ("UDCC") is the entity in Utah that accepts and maintains a record of filed UCC financing statements. The UDCC uses a database search engine to retrieve financing statements filed with the UDCC. The UDCC also maintains a record of all corporations that have been organized in Utah. CWM's name, as listed on the public record, is "C. W. Mining Company." Thus, CWM's proper name includes a period after the letters "C" and "W" and a space after each period.

Kathy Berg, the director of the UDCC, submitted a sworn declaration in this case. Ms. Berg confirmed that CWM is a Utah corporation and that in the UDCC's records the registered name of CWM is "C. W. Mining Company."[18] Ms. Berg also attested that "the Utah database search engine will only retrieve certified search queries having the exact same spacing and punctuation as the database entry."[19] Thus, the Appellants' UCC financing statements do not appear under a search of the UDCC's records using the UDCC's standard search logic and CWM's proper name.

Because the Appellants' financing statements did not appear under a search for the UDCC's records using standard search logic, the bankruptcy court found that the financing statements were "seriously misleading and do not perfect any security interest in any account or

---

[18]*See id.* at 298–302.

[19]*Id.* at 299.

9

the UEI Receivable."[20]  In its final order, the bankruptcy court awarded judgment "avoiding all of the security interests and assignments of accounts claimed by [Appellants] arising under any security agreement, disguised security agreement or assignment of accounts, of which [Appellants] could have given notice."[21]

## II.  JURISDICTION

This Court has jurisdiction over the instant appeal under 28 U.S.C. § 158(a) and rules 8001 and 8002 of the Federal Rules of Bankruptcy Procedure.

## III.  STANDARD OF REVIEW

A trial court may properly grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[22]  "When applying this standard, [the Court] examine[s] the factual record in the light most favorable to the party opposing summary judgment."[23]  The Court reviews the bankruptcy court's grant of summary judgment de novo.[24]  "This Court must also reach its own conclusions regarding state law legal issues, without deferring to the bankruptcy court's interpretation of state law."[25]

---

[20]*Id*. at 1506.

[21]*Id*. at 1602–03.

[22]Fed. R. Civ. P. 56(a).

[23]*Belhomme v. Widnall*, 127 F.3d 1214, 1216 (10th Cir. 1997) (citing *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1234–35 (10th Cir. 1997)).

[24]*Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1201 (10th Cir. 2007) (internal citation omitted).

[25]*Redmond v. Lentz & Clark, P.A. (In re Wagers)*, 514 F.3d 1021, 1024 (10th Cir. 2007) (per curiam) (citing *Hofer v. Unum Life Ins. Co. of Am.*, 441 F.3d 872, 875 (10th Cir. 2006); *Kelaidis v. Cmty. First Nat'l Bank (In re Kelaidis)*, 276 B.R. 266, 270 n.1 (10th Cir. BAP 2002);

IV.  DISCUSSION

Appellants raise eight issues on appeal.  These issues center on three general claims.

Appellants claim that the bankruptcy court (1) erred in interpreting the Advance Payment

Agreement and Agency Agreement as loan and security agreements rather than purchase

agreements, (2) erred in finding that the Appellants' UCC financing statements were ineffective

to perfect the Appellants' underlying security interests, and (3) granted relief in its final order

that was overly broad and impermissibly at odds with its Amended Memorandum Decision.

A.      CONTRACT INTERPRETATION

Standard asserts that, in its consideration of the agreements, the bankruptcy court

improperly excluded parol evidence, ignored key provisions of the agreements, and excluded

extrinsic evidence that was relevant to the determination of facial ambiguity.  The Trustee

contends that the bankruptcy court properly excluded parol evidence and ruled as a matter of law

because the parties' agreements were integrated and unambiguous.

The Court applies Utah law in interpreting the relevant agreements.[26]  In Utah, the

application of the parol evidence rule is a "two-step process: 'First, the Court must determine

whether the agreement is integrated.  If the Court finds that the agreement is integrated, then

---

*In re Thompson*, 240 B.R. 776, 779 (10th Cir. BAP 1999)).

[26]*See Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1341 (10th Cir. 1996) (applying Colorado law to determine whether investor had claim against Chapter 7 debtor); *see also Matter of Haber Oil Co., Inc.*, 12 F.3d 426, 443 (5th Cir. 1994); *Okla. Plaza Investors, Ltd. v. Wal–Mart Stores, Inc. (In re Okla. Plaza Investors, Ltd.)*, 203 B.R. 479, 481 (N.D. Okla. 1994).

parol evidence may be admitted only if the Court makes a subsequent determination that the language of the agreement is ambiguous.'"[27]

1.    INTEGRATION

Standard argues that the bankruptcy court erred in finding that the Advanced Payment Agreement and Agency Agreement were integrated documents.  Standard's argument is based on the following language found in the Advance Payment Agreement: "Standard may from time to time make advance payments . . . as the parties may mutually agree."[28]

At the outset, the Court notes that it will not address issues raised for the first time on appeal.[29]  Standard asserts that it raised the issue of integration before the bankruptcy court.  In support of its argument, Standard quotes two paragraphs founds in its Memorandum in Support of Motion to Revise Memorandum Decision Granting in Part Trustee's Motion for Partial Summary Judgment as to UEI Receivable.[30]  The paragraphs quoted however do not discuss integration.  Those paragraphs assert that the language "as the parties may mutually agree" found in the Advanced Payment Agreement "requires the court to examine . . . future purchases, not to construe the [Advanced Payment Agreement] itself, but to construe the details of such future coal

---

[27]*See Tangren Family Trust v. Tangren*, 182 P.3d 326, 330 (Utah 2008) (quoting *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1027 (Utah 1995)).

[28]Docket No. 17, at 609.

[29]*See Yapp v. Excel Corp.*, 186 F.3d 1222, 1230 (10th Cir. 1999) (citing *Rademacher v. Colo. Ass'n of Soil Conservation Dists. Med. Benefits Plan*, 11 F.3d 1567, 1571 (10th Cir. 1993)).

[30]*See* Docket No. 46, at 15.

purchase agreements."[31]  This language does not discuss integration.  Indeed, it supports the bankruptcy court's finding that the agreements were integrated.  For this reason, the Court finds that integration was not "clearly the issue discussed" before the bankruptcy court.[32]

Further, even were the Court to consider this issue on appeal, it could not conclude that the bankruptcy court committed clear error in finding the agreements to be integrated.[33]  "A finding is not clearly erroneous unless 'it is without factual support in the record or if, after reviewing all of the evidence, [the Court is] left with the definite and firm conviction that a mistake has been made.'"[34]  "In addition, [the Court is] required to view the evidence in the light most favorable to the [bankruptcy] court's ruling and must uphold any [bankruptcy] court finding that is permissible in light of the evidence."[35]  Reviewing the record in this light, the Court is persuaded that the bankruptcy court permissibly found that the agreements "constituted a final expression of one or more terms" of the parties' agreement and "contain[ed] the whole of the agreement between the parties."[36]  In short, Appellants' integration argument fails procedurally and on the merits.

---

[31]*Id.*

[32]*Id.* at 16.

[33]*See Tangren Family Trust*, 182 P.3d at 329 (internal citations omitted) (holding that "[w]hether a contract is integrated is a question of fact reviewed for clear error").

[34]*In re Ford*, 492 F.3d 1148, 1153 (10th Cir. 2007) (quoting *Connolly v. Harris Trust Co. of Cal. (In re Miniscribe Corp.)*, 309 F.3d 1234, 1240 (10th Cir. 2002)).

[35]*Id.* at 1154 (internal quotation marks and citation omitted).

[36]*See Tangren Family Trust*, 182 P.3d at 330 (internal quotation marks and citations omitted).

2.     AMBIGUITY

Because the agreements are integrated documents, parol evidence is only admissible if the agreements are ambiguous.  "A contract qualifies as ambiguous if it lends itself to 'more than one reasonable interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies.'"[37]  Utah courts have made clear that "[c]ontract construction 'begins and ends with the language of the contract.'"[38]  However, in addition to finding ambiguity in the express terms of a contract, the Court may also find "ambiguity in a contract taken as a whole."[39]  "In interpreting a contract, [the reviewing court] look[s] to the writing itself to ascertain the parties' intentions, and . . . consider[s] each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none."[40]

> The court may consider any "relevant and credible evidence of contrary interpretations" in making this legal determination.  If the court concludes that "the interpretations contended for are reasonably supported by the language of the contract," the contract is ambiguous on its face.  Only then does the question of ambiguity become factual, requiring the court to admit parol evidence of the parties' intentions in order to clarify the ambiguity.[41]

---

[37]*J.R. Simplot v. Chevron Pipeline Co.*, 563 F.3d 1102, 1109 (10th Cir. 2009) (quoting *WebBank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1145 (Utah 2002)).

[38]*United States v. Dunn*, 557 F.3d 1165, 1172 (10th Cir. 2009) (quoting *Daines v. Vincent*, 190 P.3d 1269, 1277 (Utah 2008)); *see also Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 207 P.3d 1235, 1240 (Utah 2009) ("Where the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law.  Only if the language of the contract is ambiguous will we consider extrinsic evidence of the parties' intent." (quotations omitted)).

[39]*Daines*, 190 P.3d at 1277 (citing *WebBank*, 54 P.3d at 1146–47).

[40]*WebBank*, 54 P.3d at 1144 (internal quotation marks and citations omitted).

[41]*J.R. Simplot*, 563 F.3d at 1109 (quoting *Daines*, 190 P.3d at 1276).

"Specifically in the context of whether a particular agreement should be considered a secured transaction for purposes of Article 9 of the UCC" the Utah Supreme Court has "extended the notion of ambiguity in contracts to include instances where, despite the lack of ambiguity in the terms and provisions of the contract themselves, an ambiguity exists as to the nature and character of the contract or transaction a whole."[42]

The parties propose conflicting interpretations of the meaning and nature of the Advanced Payment Agreement and Agency Agreement.  The Trustee asserts that, when considered as a whole, the agreements unambiguously provide security for loans issued by Standard to CWM. Standard, on the other hand, contends that it pre-purchased coal from CWM and took title to that coal the instant it was mined.  As such, under Standard's interpretation of the agreements, it owned the coal mined by CWM—and in this case, sold to UEI—the moment the coal was extracted from the coal seam.

Turning first to the Trustee's proposed interpretation, the Court finds that there is ample support for that interpretation in the language of both agreements.  The preamble to the Advanced Payment Agreement provides that CWM was in need of financing to pay for operating expenses and to upgrade its mining operations.  Paragraph eight of the same agreement provides for repayment of any amount financed in cash or coal.  These terms support the Trustee's interpretation because they give Standard, as the lender, opportunity to recover through cash or coal, thereby removing any limitation to mere title in coal.  This clause is particularly helpful to a

---

[42]*WebBank*, 54 P.3d at 1145 (citing *Colonial Leasing Co. of New England, Inc. v. Larsen Bros. Constr. Co.*, 731 P.2d 483, 487 (Utah 1986)).

lender who, in attempting to recover amounts lent, finds that security in coal is worth less than available cash collateral.

Paragraph thirteen of the Advanced Payment Agreement similarly grants Standard a security interest in CWM's other property to secure the amount advanced to CWM. The remaining paragraphs of that agreement set out interest rates to be paid on the amounts advanced and other terms indicative of a lending relationship. The Agency Agreement contains similar language discussing the provision of financing to CWM and the interest rate that would apply on amounts loaned.

Standard's proposed interpretation also finds support in the agreements. Paragraph three in the Advanced Payment Agreement provides that "Standard's payments to CWM are advance payments for purchase of coal not yet mined, for which Standard shall have full legal and equitable title to the coal as it is mined by CWM, and shall not be construed as a mere loan to CWM."[43] Similarly, paragraph three of the Agency Agreement states in relevant part: "All legal and equitable title to the coal produced by [CWM] shall transfer from [CWM's] lessor to [Standard] immediately upon severance of the coal from its seam, thereby absolutely and irrevocably divesting [CWM's] lessor of title and simultaneously vesting [Standard] with all right, title and interest in and to the coal."[44] A plain reading of these terms directly supports Standard's proposed interpretation.

In its interpretation of the relevant agreements, the bankruptcy court considered the language provided above but discounted it as "a gratuitous statement that does not bear on the

---

[43]Docket No. 30 Ex. 1, at 2.

[44]*Id*. Ex. 2, at 1.

16

legal interpretation of the contracted terms."[45]  The bankruptcy court went on to hold that "[a]lthough Standard and [CWM] stated their desire to not have the advance payments under the agreement treated as a mere loan, that statement does not create an ambiguity that requires this Court to consider parol evidence because the effective terms of the contract are not facially ambiguous."[46]  This Court must disagree.

The purpose of contract interpretation is to ascertain the parties' intentions.  In doing so the Court considers "each contract provision in relation to all of the others, with a view toward giving effect to all and ignoring none."[47]  Applying this standard, the Court finds that Standard has provided a tenable interpretation that is supported by the terms of the agreements.  The explicit statements in the Advanced Payment Agreement and Agency Agreement provide that in exchange for advanced payments Standard shall receive "full legal and equitable title to the coal."  These explicit references of the parties' intent cannot be ignored.

In sum, because the parties "'present contrary, tenable interpretations' of the nature and character of the [agreements] and the transaction as a whole," the Court concludes that there is an ambiguity as to whether Standard and CWM intended to create a genuine assignment or loan transaction disguised as an assignment.[48]  "Such ambiguity may be resolved only by the trier of fact after consideration of parol or extrinsic evidence as to the parties' intentions, that is, a review

---

[45]Docket No. 17, at 1496.

[46]*Id*. at 1497.

[47]*WebBank*, 54 P.3d at 1144 (internal quotation marks and citations omitted).

[48]*Id*. at 1146 (citing *SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 28 P.3d 669, 675 (Utah 2001)).

17

and evaluation of all the facts and circumstances surrounding the substance of the transaction."[49]

For this reason, the Court finds that the bankruptcy court erred in granting summary judgment to

the Trustee on this issue.

B.      UTAH CODE ANN. § 70A-9a-506(3)

Appellants take issue with the bankruptcy court's order avoiding the perfection of

security interests in favor of Appellants.  Specifically, Appellants assert that the bankruptcy court

improperly found that their financing statements did not qualify for the "escape hatch" provision

found in Utah Code Ann. § 70A-9a-506(3).

A security agreement is generally effective against purchasers of collateral and creditors

according to its terms between the parties to that agreement.[50]  To maintain a security interest in

an account receivable, a creditor must properly perfect its security interest.[51]  In Utah, this is

accomplished by filing a UCC financing statement with the UDCC.  To be effective, a financing

statement must indicate the collateral covered and provide the name of the debtor and the secured

party.[52]  "A financing statement sufficiently provides the name of the debtor: (a) if the debtor is a

registered organization, only if the financing statement provides the name of the debtor indicated

on the public record of the debtor's jurisdiction of organization which shows the debtor to have

---

[49]*Id*. at 1147 (internal citations omitted).

[50]Utah Code Ann. § 70A-9a-201(1).

[51]*See generally id*. §§ 70A-9a-301–310.

[52]*See id*. § 70A-9a-502(1).

18

been organized."[53]  A financing statement that does not contain the debtor's registered

organization name is "seriously misleading."[54]

If a creditor fails to use the registered organization name, there is "an escape hatch"

available that provides as follows:

> If a search of the records of the filing office under the debtor's correct name, using
> the filing office's standard search logic, if any, would disclose a financing
> statement that fails sufficiently to provide the name of the debtor in accordance
> with § 70A–9a–503(l), the name provided does not make the financing statement
> seriously misleading.[55]

Here, CWM's registered organization name is "C. W. Mining Company," with periods

after the letters and spaces between.  The financing statements filed by Appellants each provide

CWM's organization name as either  "CW Mining Company" or "C W Mining Company."

Thus, the financing statements fail to properly list CWM's registered organization name.  The

Berg Affidavit indicates that using the UDCC's standard search logic, a search of the UDCC's

database using CWM's registered organization name does not reveal the financing statements.

Therefore, under the plain language of applicable Utah statutory code, the Appellants' financing

statements were seriously misleading.  Nevertheless, Appellants assert that their financing

statements were not seriously misleading because a "reasonably diligent searcher" could have

discovered the Appellants' interests by following several clear links to all filings under CWM's

organization number.

---

[53]*Id*. § 70A-9a-503(1).

[54]*Id*. § 70A-9a-506(2).

[55]*Id*. § 70A-9a-506(3).

The Court finds the reasoning and holding of *Host America Corporation v. Coastline Financial, Inc.*,[56] to be directly on point.  In *Host America*, this Court considered whether a creditor's failure to include two periods in a debtor's name made that creditor's financing statement seriously misleading and rendered it ineffective.[57]   The court concluded that, "following the plain language of the relevant statutes," the creditor's financing statement was seriously misleading and his security interest was therefore unperfected.[58]   The *Host America* court reasoned that "[t]he plain language of section 70A-9a-506(3) establishes an escape hatch to creditors who list an improper debtor name only to the extent that the state's standard search logic can compensate for that error.  By necessity, the breadth of the safe haven provided by section 70A-9a-506(3) will either expand or contract as the capabilities of the state's standard search logic change over time."[59]

As in this case, the *Host America* court received a declaration from Kathy Berg, the director of the UDCC, indicating that "a search under [the debtor's] correct name using the filing office's standard search logic would not have revealed [the creditor's] security interest."[60] Because "[t]he escape hatch provision is expressly tied to the state's search logic," any listing of the debtor's name that would not appear under the state's standard search logic does not qualify for the escape hatch provision found in Utah Code Ann. § 70A-9a-506(3).  "This is so even

---

[56]2006 WL 1579614 (D. Utah May 30, 2006).

[57]*Id*. at *3–5.

[58]*Id.* at *6.

[59]*Id*. at *5.

[60]*Id*.

when, as here, a search under the debtor's correct name, using the filing office's standard search logic, fails to retrieve financing statements with relatively minor errors."[61]  "In short, the legislature elected to leave the fate of those creditors that fail to comply with the strict naming requirement of section 70A-9a-503(1) in the hands of those that develop and manage the filing office's search logic."[62]

Appellants argue that the court's holding in *Host America* is not controlling because *Host America* is not a published decision and because there was no indication in that case that the disputed filing could have been discovered by following an obvious link to the filing in question. The Court is not persuaded.  A publisher's administrative determination of whether to publish a prior decision of this Court in the federal register has no bearing on its persuasive authority. And, while other courts have continued to apply the "reasonably diligent searcher" standard advanced by Appellants,[63] the better approach is that followed by the majority of courts that have decided this issue and found that revised Article 9 is unforgiving of even minimal errors.[64]

Thus, although sympathetic to Appellants' position, the Court concludes that Appellants' financing statements failed to properly list CWM's registered organization name.  Therefore, the bankruptcy court properly found that the financing statements were seriously misleading and do not perfect any security interest in any account or the UEI Receivable.

---

[61] *Id.*

[62] *Id.*

[63] *See In re Summit Staffing Polk Cty, Inc*., 305 B.R. 347, 354 (Bankr. M.D. Fla. 2003).

[64] *See In re John's Bean Farm of Homestead, Inc.*, 378 B.R. 385, 391 (Bankr. S.D. Fla. 2007).

C.      OVERBREADTH

Appellants assert that the bankruptcy court's final order is impermissibly broad and varies from the Memorandum Decision because it contains language potentially encompassing accounts and assignments that are not the subject of the adversary proceeding.

In Count III of its Complaint, the Trustee requested judgment declaring the accounts transferred to Standard, including amounts owed under the UEI Agreement, to be property of the estate.  The bankruptcy court's final order granted this relief.  The language included in the bankruptcy court's Memorandum Decision that limited its ruling to the UEI Receivable can be read in harmony with the more broad language found in the final order.  It goes without saying that the bankruptcy court's order has no effect on property that is not the subject of the Trustee's motion.  The language of the Memorandum Decision merely reflects this limitation.  This is not to say that the same reasoning found in the Memorandum Decision may not apply to future disputes involving these parties.  The bankruptcy court is free to apply the same reasoning to future proceedings as it sees fit.

Additionally, Appellants' argument that the bankruptcy court's final order is overly broad because it avoided the Appellants' security interests themselves and not just the perfection of the security interests is specious.  As Appellants recognize, the bankruptcy court found in its Amended Memorandum Decision that the Trustee could avoid the perfection of the security interests under 11 U.S.C. § 544(a).  "The rights conferred by § 544 of the Bankruptcy Code give the trustee the power to avoid unperfected security interests."[65]  Thus, whether stated as avoiding the perfection of the security interest, or avoiding the interest itself, the result is the same.

[65]*Pearson v. Salina Coffee House, Inc.*, 831 F.2d 1531, 1537 (10th Cir. 1987).

In sum, the Court finds that the language of the bankruptcy court's final order is not impermissibly broad or contrary to the Memorandum Decision.

V.  CONCLUSION

Based on the foregoing,  it is hereby

ORDERED that the judgment of the bankruptcy court is AFFIRMED except as to its determination that the agreements and transaction between CWM and Standard was unambiguous.  The case is REMANDED for further proceedings consistent with this Order.

DATED  March 8, 2013.

BY THE COURT:

_____

TED STEWART
United States District Judge